**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| LINDA T. DANDRIDGE, individually and as personal representative of the estate of THOMAS C. DANDRIDGE, JR., deceased, ) ) ) ) | |
| Plaintiffs, ) ) | No. 2:12-cv-00484-DCN |
| vs. ) ) | **ORDER** |
| CRANE CO., *et al.*, ) ) | |
| Defendants. ) ) | |

This matter is before the court on defendant Crane Co.'s ("Crane")[1] motion for summary judgment. For the reasons stated below, the court grants Crane's motion.

## I. BACKGROUND

From 1965 to 1976, Thomas C. Dandridge, Jr. ("Dandridge") was employed as a pipefitter and coppersmith at the Charleston Naval Shipyard (the "shipyard") in Charleston, South Carolina. Over the course of his employment, Dandridge was exposed to asbestos while working with and around various asbestos-containing products, including products used in valves manufactured and sold by Crane. Specifically, plaintiff Linda T. Dandridge ("plaintiff") alleges that Dandridge was exposed to asbestos contained in flange gaskets used to link Crane valves to pipe lines. Def.'s Mot. Ex. C, Dandridge Video Dep. 144:13–16.

On January 24, 2012, Dandridge and plaintiff filed this action in the Court of Common Pleas in Charleston County, bringing claims against a number of defendants including Crane Co. The action was removed to this court on February 21, 2012. On

---
[1] Although this action has involved dozens of parties, Crane is the only remaining defendant.

1

January 13, 2013, following Dandridge's death, plaintiff amended the complaint to bring claims against the defendants in both her individual capacity and as the personal representative of Dandridge's estate.

Plaintiff brings claims against Crane for negligence, negligent failure to warn, breach of the implied warranty of merchantability, strict liability, fraud, fraudulent misrepresentation, breach of post-sale duty to warn, wrongful death, and loss of consortium. Crane moved for summary judgment as to all claims on November 16, 2015. Plaintiff responded to Crane's motion on November 19, 2015, and Crane replied on December 3, 2015. This motion is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Anderson, 477 U.S. at 255.

### III.   DISCUSSION

At the outset, the parties agree that this case falls within the court's admiralty jurisdiction; therefore, maritime law applies. Def.'s Mot. 4–5; Pl.'s Resp. 1 n.1.

Under maritime law, a manufacturer is liable for "harm caused by a product sold 'in a defective condition unreasonably dangerous.'" Conner v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 796 (E.D. Pa. 2012) (quoting Restatement (Second) of Torts § 402A (1965)). "Liability for defective products has grown into three distinct theories of liability: manufacturing defects, design defects, and defects based on inadequate warnings." Id. (citing Restatement (Third) of Torts: Prods. Liab. § 2 (1998)). "A manufacturer is also liable for the harm resulting from the negligent failure to warn of the risks created by its products." Id.

Under any theory of product liability, plaintiff must establish causation with respect to each defendant manufacturer. Id. ("[W]hether in strict liability or negligence, a

3

plaintiff must establish causation with respect to each defendant manufacturer."); Stark v. Armstrong World Indus., Inc., 21 F. App'x 371, 375 (6th Cir. 2001) ("[I]n order to maintain an action for either negligence or strict liability under maritime law, a plaintiff must show causation of his injury by either the defendant's negligence or the product defect."). To establish causation under maritime law, a plaintiff must show: "(1) that the plaintiff was exposed to the defendant's product and (2) that the product was a substantial factor in causing the plaintiff's injury." Conner, 842 F. Supp. 2d at 797. "A manufacturer is not liable for asbestos-containing components and replacement parts it did not manufacture or distribute." Id. (citing Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005)). This principle is often referred to as the "bare metal" defense. Various Plaintiffs v. Various Defendants, 856 F. Supp. 2d 703, 709 (E.D. Pa. 2012).

      Plaintiff does not contend that Crane manufactured the flange gaskets Dandridge encountered while working at the shipyard.[2] See Pl.'s Resp. 8 (arguing that Crane had "a duty to warn Mr. Dandridge about asbestos exposure resulting from flange gaskets used with its valves"); see also Def.'s Mot. Ex. D (Crane flange gaskets not included on list of asbestos-containing products Dandridge alleges he encountered). This alone would appear to warrant summary judgment under the bare metal defense, as applied in Lindstrom and Conner. See Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d at 496 (finding that "[defendant] cannot be held responsible for the asbestos contained in another product" where evidence showed plaintiff was exposed to asbestos from another

---

[2] Indeed, it appears that such gaskets were fashioned from sheet material in the shipyard's "gasket room" or "gasket shop." See Pl.'s Resp. Ex. A and Def.'s Mot. Ex. C, Dandridge Video Dep. 32:17–33:14 (describing the process of cutting gaskets in the gasket room); see also Pl.'s Resp. Ex. C and Def.'s Reply Ex. A, Cook Dep. 122:4–123:3 (describing ventilation and breathing conditions in the "gasket cutting area").

4

company's products which were attached to defendant's product); Conner, 842 F. Supp. 2d at 803 (granting summary judgment on plaintiffs' strict liability and negligence claims where plaintiffs failed to point to any evidence that "[d]efenants manufactured or distributed the asbestos products to which [d]ecedents were allegedly exposed").

However, certain courts—including one in this district—have found that the bare metal defense does not immunize manufacturers from liability under a failure-to-warn theory where "it was not just foreseeable, but inevitable, that the product would subject those working with it to the possible hazards of asbestos exposure." Quirin v. Lorillard Tobacco Co., 17 F. Supp. 3d 760, 771 (N.D. Ill. 2014); Andrews v. 3M Company, et. al., No. 2:13-cv-2055, Dkt. No. 411 (D.S.C. May 22, 2015) ("[T]he Court follows Quirin and holds that [defendant] can be legally responsible for internal asbestos-containing replacement packing under certain circumstances, even if there is no direct evidence that [defendant] supplied the replacement packing."); see also Kochera v. Foster Wheeler, LLC, 2015 WL 5584749, at *4 (S.D. Ill. Sept. 23, 2015) ("Like the Quirin court, this Court is not convinced that a manufacturer should avoid liability on a failure to warn theory where it designed its products to be used with asbestos-containing materials.").

Crane argues that the court should ignore Quirin because it is "inconsistent with Lindstrom and the well-reasoned weight of authority." Def.'s Reply 3. Indeed, the Quirin court acknowledged "that its conclusion differs from that reached by those courts that have relied on the 'bare metal defense' to strictly limit liability where a manufacturer did not make the actual product allegedly causing asbestos exposure." Quirin, 17 F. Supp. 3d at 771. At the same time, the Quirin approach appears to be a rational exception to the rule that a defendant "cannot be held responsible for the asbestos contained in

5

another product," see Lindstrom, 424 F.3d at 496, because a product that "inevitably" subjects its user to "the possible hazards of asbestos exposure" and a product that actually contains asbestos bear comparable causal relationships to their users' injuries.[3] Ultimately, this court need not decide whether to recognize Quirin or not, as plaintiff has failed to demonstrate a genuine issue of material fact even under the Quirin standard.[4]

In Quirin, the court found that a manufacturer's duty to warn of risks relating to asbestos-containing materials arose where: (i) the manufacturer "designed its products to be used with asbestos-containing materials and actually incorporated asbestos-containing materials into the products it sold;" (ii) the manufacturer's product "needed asbestos-containing components to function properly" when used in the manner intended by the purchaser; and (iii) the manufacturer "provided specifications" for such use. Quirin, 17 F. Supp. 3d at 770–71 (emphasis in original). Another court in this district has similarly found that a duty to warn exists where a manufacturer "actually incorporated asbestos-containing components into its product (even if it did not supply the replacement parts at issue) and specified the use of asbestos-containing replacement parts in its product." See Andrews v. Crane Co., et. al., No. 2:13-cv-2055, Dkt. No. 547 (D.S.C. July 8, 2015)

---

[3]   Though Quirin appears to be in conflict with Conner—a case decided by Judge Robreno, who has presided over numerous asbestos MDL cases—Quirin is more consistent with a later opinion from Judge Robreno in Salisbury v. Asbestos Corp., 2014 WL 345214, at *1 n.1 (E.D. Pa. Jan. 29, 2014). In Salisbury, the court rejected a defendant shipbuilder's argument that it had no duty to warn of asbestos-containing insulation unless the plaintiff established that "he was exposed [to] the same asbestos insulation that [d]efendant originally installed aboard the ship." Id. The court found that it was "the jury's role to determine whether [d]efendant's failure to warn about the insulation at issue (whether original or replacement insulation) was reasonable under the circumstances, and whether that failure to warn was the cause of [p]laintiff's injury." Id.

[4]   Plaintiff also argues that the court should supplement maritime law with non-conflicting state law. Pl.'s Resp. 6. Plaintiff appears to simply argue that certain state law cases which have followed Quirin or otherwise rejected the bare metal defense should effectively tip the scales in favor of recognizing Quirin. Id. To the extent this is plaintiff's intent, the court finds it unnecessary to decide this issue for the reasons stated above. To the extent plaintiff seeks to follow a standard different from the one set forth in Quirin and other admiralty cases, the court regards plaintiff's argument as an attempt to apply conflicting state law, which is clearly prohibited. See, e.g., State of Md. Dep't of Natural Res. v. Kellum, 51 F.3d 1220, 1226 (4th Cir. 1995) ("[S]tate law may not be applied if it conflicts with, or seeks to materially change, federal maritime law.").

(citing Quirin, 17 F. Supp. 3d at 770). Crucially, the circumstances presented in both Quirin and Andrews were sufficient to invoke Quirin's underlying rationale—that a duty to warn arises when a defendant manufacturer's conduct makes the plaintiff's asbestos exposure "inevitable," not simply foreseeable. Quirin, 17 F. Supp. 3d at 770. Outside of such "inevitabilty," there is a weaker causal relationship between the manufacturer's conduct and the plaintiff's injuries, and consequently, less justification for a departure from the general rule under maritime law that "a manufacturer is not liable for harm caused by, and owes no duty to warn of the hazards inherent in, asbestos products that the manufacturer did not manufacture or distribute." Conner, 842 F. Supp. 2d at 801. As such, the court finds that if Quirin is viable at all, it must be applied narrowly.

Here, plaintiff has failed to present evidence that Crane's manufacture and distribution of its valves made it inevitable that Dandridge would encounter asbestos-containing materials. At best, there appears to be evidence that some of Crane's valves were designed to be used with asbestos-containing flange gaskets in certain high-heat applications[5] and that Crane recommended the use of such gaskets. See Pl.'s Resp. Ex. O, Pantaleoni June 17, 2015 Test. 2186:20–2187:25 (stating Crane knew an asbestos-containing gasket would be used in certain high-heat applications, Crane knew the application each valve was intended for when it was distributed, and acknowledging certain alternative gasket materials were ineffective at high temperatures); Pl.'s Resp. Ex. R (Crane valves manual, dated 1980, recommending asbestos-containing "cranite" flange gaskets for "steam, water, air, gas, and many other" uses). While such evidence may

---

[5] Notably, plaintiff has not provided a clear indication of the types of Crane valves and gasket applications Dandridge worked with. There is evidence that Dandridge encountered a variety of Crane valves. Def.'s Mot. Ex. A and Pl.'s Resp. Ex. I, Dandridge Dep. I 36:1–6; Def.'s Mot. Ex. B and Pl.'s Resp. Ex. B, Dandridge Dep. II 95:8–13. The court offers no opinion on whether this is sufficient to raise a reasonable inference that Dandridge encountered Crane valves that were used in the high-heat applications where asbestos-containing flange gaskets were intended, as plaintiff's motion fails on other grounds.

suggest that some of Crane's valves "required" asbestos-containing gaskets when used in high-heat applications and that Crane "provided specifications" for such use, see Quirin, 17 F. Supp. 3d at 770, there is no evidence that Crane "actually incorporated asbestos-containing materials into the products it sold." Id. at 771.

This omission is fatal to plaintiff's claim. Though the court in Kochera v. Foster Wheeler, LLC, 2015 WL 5584749, at *1 applied Quirin to find a duty to warn even where the defendant played no role in incorporating asbestos-containing material into its product, this court does not believe Quirin extends that far. See Kochera, 2015 WL 5584749, at *1 (denying summary judgment on plaintiff's failure to warn claim, even though defendant's products did not have asbestos-containing materials installed on them until after they left defendant's control). As an initial matter, the Kochera decision rests on a finding that "it was foreseeable [that] the product would subject those working with it to the possible hazards of asbestos exposure," Kochera, 2015 WL 5584749, at *4 (emphasis added), while Quirin explicitly demands that such exposure be "not just foreseeable, but inevitable." Quirin, 17 F. Supp. 3d at 771 (emphasis added). Moreover, the Quirin court specifically tied the duty to warn to a finding that "the manufacturer incorporated the asbestos-containing material into its product," id. at 770 (emphasis added), and highlighted this finding in various parts of its opinion. See id. at 770–71 ("[E]ven if replacement gaskets and packing for the Crane Co. valves were supplied by a third party, it is reasonable to infer that those replacement parts would have been substantially identical to the components originally supplied by Crane Co."); id. at 771 ("In contrast, Crane Co. had no duty to warn . . . where it did not supply the original insulation and other materials used with the piping systems into which its valves were

incorporated."); id. ("[The court] is not convinced, however, that a manufacturer should avoid liability on a failure-to-warn theory, where it designed its products to be used with asbestos-containing materials and actually incorporated asbestos-containing materials into the products it sold."). It is also significant that previous decisions recognizing Quirin in this district included a finding that the defendant "actually incorporated asbestos-containing components into its product." Andrews, No. 2:13-cv-2055, Dkt. No. 547. Finally, as discussed above, the weight of authority in favor of the bare metal defense and the rationale underlying the Quirin decision require this court to apply it narrowly. Thus, even under Quirin, the court cannot find that Crane owed Dandridge any duty to warn unless it can find that Crane somehow "incorporated" asbestos-containing flange gaskets into its valves.

Plaintiff attempts to show that Crane distributed asbestos-containing flange gaskets with its valves by highlighting Dandridge's deposition testimony that "the gaskets" came "from the factory." Pl.'s Resp. 8. However, Dandridge's testimony does not support such a conclusion when read in full. The relevant exchange began when Dandridge was asked whether valves were delivered to the shipyard "bare metal" or "pre-insulated at the factory," and continued as follows:

> A. The only thing they (sic) would come from the factory is the gaskets and the stuffing around the stem and stuff like that, that would come in it, but there would be nothing on the outside of it.
>
> Q. And is it your memory that all the valves came with the flange gaskets already on there or did the Shipyard –
>
> A. No, they came with a blank.
>
> Q. A blank?
>
> A. A blank buttoned up to the flange.

9

> [. . .]
>
> Q. [A blank is] [j]ust a sheet of thick plastic that fits over and seals that opening and protects the flange?
>
> A. Right.

Dandridge Dep. I 128:1–129:13 (emphasis added). First, Dandridge's phrasing strongly suggests that he was not referring to flange gaskets when he stated that "gaskets" came from the factory. See id. Because Dandridge first listed the items that "would come from the factory" and then stated that such items "would come in it" one must reasonably assume that the referenced "gaskets" were internal gaskets, not flange gaskets—which are used on the outside of the valve. See id. (emphasis added). The reading is confirmed by Dandridge's subsequent clarification that "the [s]hipyard . . . would later install the actual flange gasket." Id. at 129:11–13. Following this statement, Dandridge goes on to reference the manufacture of gaskets in the shipyard's gasket shop. See id. at 129:18–25; see also Dandridge Video Dep. 32:17–34:15 (describing process of cutting gaskets from sheet gasket material and using such gaskets with various valves, including Crane valves). Thus, it is clear from Dandridge's testimony that the only gaskets that came "from the factory" were internal gaskets, which are not relevant to this case, while the flange gaskets came from the gasket shop.[6] See id. at 128:1–129:25.

Next, plaintiff contends that a statement from a 1923 catalogue that "[Crane] will always furnish valves complete with companion flanges, gaskets, and bolts" indicates a regular practice of providing asbestos-containing material alongside its valves which

---

[6] Dandridge appears to reference another source of gaskets, stating that "[in later years,] when they really started pushing the gaskets and all, they took manufacturing the gaskets away from the shop." Dandridge Dep. I 129:18–20. The court was not provided with any evidence clarifying this change in policy and the plaintiff did not address it her arguments.

presumably continued until the time of Dandridge's employment—1965 to 1976. See Pl.'s Resp. 8–9, Ex. J. Plaintiff also notes a number of advertisements published in the 1940's in which Crane touted the completeness of its product offerings. See Pl.'s Resp. Ex. L (including statements such as: "every part of the piping—from pipe to valves to flange bolts and gaskets—is available from Crane," "valves, fittings, pipe, accessories, and fabricated piping—everything is specified from one line . . . everything covered by a single order to Crane," and "one source of supply"). Even if this evidence were considered in isolation, the court finds it doubtful that a catalogue produced over forty years prior to Dandridge's employment and a series of advertisements produced over twenty years prior to that time would allow a "reasonable juror" to find that Crane distributed flange gaskets alongside its valves. The catalogue is too old to provide any genuine indication of Crane's policy during the relevant time period, see Pl.'s Resp. Ex. J. (dated 1923), and while the advertisements are somewhat more relevant in time, they do not actually indicate a policy of distributing flange gaskets alongside the purchased valves. See Pl.'s Resp. Ex. L. Rather, they simply indicate that customers were able, and perhaps encouraged, to purchase flange gaskets and valves in the same order. See id. A mere suggestion or encouragement for customers to include flange gaskets in their orders does not rise to the level of "inevitability" required under Quirin.[7] See Quirin, 17 F. Supp. 3d at 771. Moreover, any inferences that might be drawn in plaintiff's favor when viewing the catalogue and advertisements in isolation become unreasonable when one considers Dandridge's testimony that the flange gaskets attached to newly supplied valves came from the gasket shop, not the manufacturer. Dandridge Dep. I 129:11–25.

---

[7]     Indeed, the advertisements could be seen as confirming that Crane valves did not come with flange gaskets, since if they did, there would be no reason to try to sell them separately.

Finally, plaintiff highlights testimony and procurement documentation indicating that the Crane sold gaskets or sheet gasket material to the Navy. See Pl.'s Resp. Ex. Q, Pantaleoni Video Dep. 152:17–153:3 (indicating that Crane sold an asbestos sheet gasket material to the Navy which was used in conjunction with Crane valves); Pl.'s Resp. Ex. N (documentation of orders for "gaskets . . . to be in accordance with Crane Company drawing 29963" shipped to Charleston, South Carolina dated 1969). Such evidence is entirely irrelevant under the Quirin inquiry, as it provides no indication that Crane "actually incorporated" asbestos-containing gaskets into the valves it manufactured and sold. See Quirin, 17 F. Supp. 3d at 771. While this evidence would be relevant if plaintiff alleged that he was directly injured by Crane manufactured flange gaskets, plaintiffs have not advanced any such theory in connection with this motion.

Even if the court considered such a theory, the evidence does not establish a genuine issue of material fact. The cited testimony—which was taken in a separate case from the Central District of California—simply shows that Crane sold asbestos-containing sheet gasket material to the Navy, without further specification. Panteleoni Video Dep. 152:17–153:3. It does not indicate when Crane sold such materials or where the Navy used such materials. Id. Though the court must draw all reasonable inferences in plaintiff's favor, the court does not find it reasonable to conclude that Dandridge used Crane manufactured asbestos-containing materials simply because Crane sold such materials to the Navy at some unspecified time and place.

As for the "gaskets" Crane shipped to the Navy's supply center in Charleston,[8] the procurement documents do not indicate, and plaintiff has not clarified, what type of

---

[8] The parties did not explain this document in great detail, but it appears from the listed "activity code" that some of these gaskets were shipped to Charleston, South Carolina. See Pl.'s Resp. Ex. N at 7

gaskets these were—i.e. flange gaskets or internal gaskets. See Pl.'s Resp. Ex. N (stating the "gasket" was "for size 1/4 inch, steel, 600 psi, angle valve . . . to be in accordance with Crane Company drawing 29963, piece 9, part number LC 11371"). Again, the court finds it unreasonable to conclude that Dandridge was exposed to Crane manufactured asbestos gaskets when there is nothing to indicate that "gaskets" described the procurement documents were the sort Dandridge would encounter—especially given his testimony indicating that the flange gaskets he worked with were manufactured in the shipyard. See id.; Dandridge Dep. I 129:11–25.

Therefore, the court finds that plaintiff has failed to demonstrate a genuine issue of material fact as to whether Crane owed Dandridge a duty to warn and whether Crane's breach of that duty caused Dandridge's mesothelioma.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** Crane's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 27, 2016**
**Charleston, South Carolina**

---

(showing that activity code NRZ/N00612 designates shipments to "Receiving Officer, Naval Supply Center, Charleston, South Carolina 29411").